COURT OF APPEALS
DECISION
DATED AND FILED

July 21, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP1922**

Cir. Ct. No. 2004CI1

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

IN RE THE COMMITMENT OF RODNEY TIMM:

STATE OF WISCONSIN,

    PETITIONER-RESPONDENT,

 V.

RODNEY TIMM,

    RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Oconto County: MICHAEL T. JUDGE, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1 HRUZ, J. Rodney Timm appeals an order denying his petition for discharge from his commitment as a sexually violent person under WIS. STAT. ch.

980 (2017-18).[1]  Upon our de novo review, we conclude as a matter of law that Timm has failed to demonstrate his condition has sufficiently changed from the time of his commitment such that he is entitled to a discharge trial.  We reach this conclusion based only upon the contents of Timm's petition and the undisputed facts of record, without our "weighing" any evidence.  Accordingly, we need not, and do not, resolve the parties' dispute over the proper standard for obtaining a discharge trial under WIS. STAT. § 980.09(2), in light of the fractured decision issued by our supreme court in *State v. Hager*, 2018 WI 40, 381 Wis. 2d 74, 911 N.W.2d 17.  For these reasons, we affirm.

## BACKGROUND

¶2      Timm was convicted in 1991 of two counts of sexual contact or intercourse with a child, and he was sentenced to two consecutive ten-year prison terms.  Additional offenses regarding forced sexual contact and sexual contact with children were dismissed and read in at sentencing, as was a single count of recklessly endangering safety.  The offenses of conviction involved Timm's sexual contact in 1989 with his then-six-year-old stepdaughter.  The presentence investigation report revealed that Timm had a lengthy history of abusing his family, including various sex acts with his children.  Timm's spouse reported that he raped her multiple times, including with objects like a piece of broom handle.  Timm was acquitted by juries of other charges of first-degree sexual assault of a child in 1986 and 1990.

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

¶3 In 2004, as Timm was nearing his parole date, the State filed a petition alleging that Timm was a sexually violent person under WIS. STAT. ch. 980. A "sexually violent person," as relevant here, is defined as someone who has been convicted of a sexually violent offense and who is dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence. WIS. STAT. § 980.01(7). The State supported the 2004 petition with an evaluation report prepared by Dr. Anthony Jurek, who concluded that Timm met the definition of a sexually violent person under § 980.01(7).

¶4 Jurek diagnosed Timm with two qualifying mental disorders: pedophilia–non-exclusive type; and sexual sadism. Jurek utilized three actuarial risk assessment tools to estimate Timm's future risk: the Rapid Risk Assessment for Sexual Offense Recidivism (RRASOR); the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R); and the Static Risk Assessment 99 (Static-99).[2] Timm's score on the RRASOR was five, corresponding to reoffense rates among the sample group of 49.8 percent and 73.1 percent over five and ten years, respectively. Timm scored a four on the MnSOST-R, which corresponded to a 29 to 45 percent risk of reoffense, depending on which baseline recidivism rate one used. On the Static-99, Timm's score of four corresponded to reconviction rates of 26, 31, and 36 percent over

---

[2] Actuarial instruments are "statistical research-based instruments that are created using data obtained by studying various factors associated with recidivism in groups of people who were convicted for sexual offenses, released, and followed over time." *State v. Combs*, 2006 WI App 137, ¶4, 295 Wis. 2d 457, 720 N.W.2d 684. Jurek noted at the time that because the instruments measure recidivism by rearrest or reconviction rate, they represent a conservative estimate of actual reoffending behavior. Jurek also noted that WIS. STAT. ch. 980 measures lifetime risk, whereas the actuarial instruments are limited to five-, ten-, or fifteen-year estimates.

five, ten, and fifteen years, respectively. Jurek also performed a dynamic risk assessment, wherein he noted that Timm liked child pornography and pornography depicting sadistic behaviors. Jurek noted that Timm had admitted he had deliberately picked women who had children in order to form relationships with those children and that he inflicted pain on his wife because it aroused him.

¶5    Psychologist Lori Pierquet, in a 2005 report, generally concurred with Jurek's assessment of Timm's disorders and his risk of reoffense according to the actuarial instruments. Like Jurek, Pierquet concluded that Timm's mental disorders made it likely that he would commit a sexually violent act in the future.

¶6    Timm ultimately waived his right to a jury trial and admitted to the contents of the petition. The circuit court then entered an order committing Timm to institutional care under the auspices of the Wisconsin Department of Health and Family Services.

¶7    Timm was reexamined at various times following his initial commitment. In each instance, the examiner concluded that Timm suffered from pedophilia and sexual sadism disorders and noted that some of Timm's actuarial results indicated that less than 50 percent of similar individuals were convicted or arrested over various time periods. Prior to 2016, the vast majority of examiners concluded that Timm was more likely than not to reoffend, but one examiner concluded that his risk fell below the legal "more likely than not" threshold and

another examiner expressed that no conclusion could be reached based on the current research on sexual recidivism.[3]

¶8    In 2016, Timm petitioned for discharge based upon psychologist Carolyn Fixmer's conclusion that he was no longer more likely than not to commit another sexually violent offense. In March 2017, however, Fixmer provided an "update report" in which she amended her opinion and concluded that Timm was likely to reoffend based upon his struggles with certain aspects of his treatment. Timm then withdrew his discharge petition.

¶9    An April 2017 treatment progress report noted Timm had been falsely reporting that he was "only masturbating to adult consensual encounters when in actuality he was entertaining deviant fantasies involving children and/or force frequently and masturbating to these deviant fantasies as well." The report

---

[3] In 2011, Timm's examiner noted that although Timm had previously been recommended for discharge, he had recently disclosed sexual involvement with two patients during that time period in which that recommendation occurred. Additionally, she noted that although Timm had "many factors in his favor" (including low actuarial risk scores and no combination of sexual deviance and psychopathy), Timm had

> regularly engaged in deviant fantasies, he admits to masturbating to those deviant fantasies, on a couple of occasions he discontinued taking psychotropic medication to reduce sexual arousal despite the fact that the medication was working, he has continued to drop treatment when he has been challenged (although he eventually rejoins groups), and he has indicated that he has trouble controlling urges and still is not confident that he will not reoffend. … General self-regulation problems, sexually deviant interests and sexual preoccupation are empirically supported Psychologically Meaningful Risk Factors that increase an individual[']s risk to reoffend. Mr. Timm has struggled extensively with these risk factors throughout the past several years.

stated that over the past year, Timm had "regressed in his ability or willingness to manage his deviant sexual interests."

¶10    Fixmer also authored a new 2017 report, which assessed Timm in several "domains," including sexually deviant interests, distorted attitudes supportive of sexual offending, impaired socio-affective functioning, impaired self-management or general criminality, and treatment progress.  In general, Fixmer identified areas where Timm had made some progress, but she noted that Timm continued to fantasize about sexual scenarios involving children and force, and Timm believed that "children were for sex."  Fixmer opined that Timm was "struggling to participate in the treatment program at a level that is sufficient to allow the identification of his treatment needs.  He remains ambivalent about change."  Ultimately, she concluded that Timm was more likely than not to commit another act of sexual violence should he be discharged.

¶11    Timm petitioned for discharge from his commitment in February 2018.  He supported his petition with a report by psychologist Charles Lodl, who opined that Timm "no longer appears to meet the legal threshold of 'more likely than not' to commit a sexually violent offense."[4]  Like Jurek, Lodl diagnosed Timm as suffering from pedophilic disorder and sexual sadism disorder, both of which Lodl concluded predisposed Timm to commit future acts of sexual violence.

---

[4] It appears Lodl used a document template and, in certain places, left unchanged the name of a prior patient.  In all instances, we view the information contained in Lodl's report as pertaining to Timm.

¶12    Lodl noted that upon Timm's admission to Sand Ridge Secure Treatment Center in 2006, he had been assigned to the COMPASS treatment track given his cognitive impairments. In February 2016, Timm began phase three of that treatment track, and he remains an active participant in group therapy, which involves presenting his sexual offense history and applying behavior therapy principles to increase healthy sexual practices and reduce deviant arousal.[5] The primary focus of his treatment, according to Lodl, is "to sustain changed behaviors, develop pro-social relationships, and sustain[] appropriate masturbation practices, more specifically eliminating imagery of children and/or forced activity with adults." Lodl believed Timm was "meaningfully participating in his treatment program" and had demonstrated a willingness to address his treatment needs. Lodl stated, however, that the "question … remains … whether or not [Timm] has demonstrated sufficiently sustained change in his thoughts, attitudes, emotions and behaviors and sufficient management of his sexual arousal such that one could reasonably assume that, with continued treatment, the change could be maintained."

¶13    Lodl noted that Sand Ridge staff members expressed their concern with Timm's ability to avoid having sexual thoughts about children, but they believed he had been more successful in reducing his deviant interest in force or violence. Timm's treatment notes stated that he continued to experience deviant sexual thoughts about children and about force or violence, and that he reported

_____

[5] The sexually violent person program at Sand Ridge consists of four phases, the last of which is intended to be completed during supervised release. The COMPASS track of the treatment program is for patients who would find the conventional track inaccessible due to its cognitive demands and who do not show marked psychopathic traits. At various times, Timm has quit sex offender treatment, then later resumed treatment. He entered phase two in 2012.

7

masturbating to that imagery. Timm eventually began reporting during group therapy that he experienced no deviant imagery and used adult consenting fantasies when masturbating.

¶14 During a polygraph assessment in September 2017, however, Timm admitted that he had intrusive thoughts about eight- to ten-year-old females four or five times over the previous three months, that he had thoughts of force or violence three to four times over the previous three weeks, and that he thought about forced anal sex on eight or nine occasions over the previous three months. Staff described Timm's efforts at self-management, relational style, and world view as "continuing to improve." Lodl acknowledged that Timm had not been completely truthful with his facilitators about his deviant thoughts and fantasies, and he opined that Timm "will have ongoing challenges with this aspect of his life and will continue to need treatment and monitoring."

¶15 Timm's discharge petition relied heavily on Lodl's use of new actuarial risk assessment tools. Unlike Jurek, Lodl did not use the RRASOR, the MnSOST-R, or the Static-99 to evaluate Timm's reoffense risk.[6] Instead, Lodl used the Structured Risk Assessment-Forensic Version (SRA-FV). That instrument requires first performing a needs assessment to determine the appropriate group with which to compare the subject. Lodl scored Timm a 3.8 on the needs assessment, which corresponded to a "level of need … best reflected by the High Risk/High Need Sample Norms." The second step of the SRA-FV uses the Static-99R, a revised version of the Static-99, to assess likelihood of reoffense.

---

[6] Timm's examiners stopped using the MnSOST-R in 2013, as its norms had not been updated and it was no longer appearing in the then-current research. As of 2014, Timm's examiners stopped using the RRASOR for the same reasons.

Timm received a score of three on the Static-99R, which corresponded to a recidivism rate in the High Risk/High Need subgroup of 11.3 percent to 17.2 percent over a five-year period and 18.2 to 28.5 percent over a ten-year period.[7]

¶16    Lodl recognized that the SRA-FV does not consider all factors associated with the risk of sexual reoffense.  Accordingly, he also scored Timm on the Violence Risk Scale-Sex Offender version (VRS-SO), which incorporates the offender's dynamic factors and attempts to account for his or her treatment gains.  Timm received a score of 39, which corresponded to a five-year "recidivism risk" of 11.1 to 15.9 percent and a ten-year recidivism risk of 18.2 to 24.2 percent.  Lodl stated that, combining the dynamic factors considered by the VRS-SO with Timm's Static-99R score, offenders with a similar combined score demonstrated a recidivism rate between a 7.4 and 12.8 percent over five years, and between 12.7 to 19.4 percent over ten years.

¶17    Ultimately, Lodl concluded that Timm no longer met the criteria for commitment as he no longer appeared to meet the legal threshold of "more likely than not" to commit a sexually violent offense.  Lodl remarked that Timm "continues to have his struggles with sexual matters, but, given his age, his treatment gains (such as they are) and his physical condition, it has become too much of a stretch to conclude that he remains [a] substantial risk."[8]

---

[7] Development on the Static-99R was completed in 2009, and that instrument was used during Timm's reevaluations starting that year.  It is undisputed that the addition of the new item regarding the subject's age on the revised instrument caused the one-point drop from Timm's original Static-99 score.

[8] Regarding Timm's physical condition, it appears he has a history of colon cancer and has had a bladder/prostate surgery that affects his sexual functioning.  It is unclear from Lodl's report, however, when these medical issues arose, and Lodl did not explain how they factored into his assessment.

¶18      The circuit court held a hearing on Timm's discharge petition on April 17, 2018. The special prosecutor argued that despite Lodl's ultimate conclusion, Lodl had acknowledged that Timm "continues to experience deviant thoughts about children and violence or force[ and] that he continues to work on that issue." Consequently, the State asserted that Timm had not demonstrated sufficient facts from which a court or jury "would likely conclude" Timm's condition had changed. In light of legislative changes made in 2013, it was necessary for Timm to make such a showing to receive a discharge trial.[9] *See* WIS. STAT. § 980.09(1), (2).

¶19      In response, Timm argued that several circumstances had changed. Timm pointed out that Lodl used different actuarial instruments than Jurek had used, and Timm's argument relied primarily upon Lodl's use of those instruments in assessing Timm's risk. Specifically, Timm noted that the Static-99R was a revision of the original instrument designed to account for an offender's reduced risk due to age, which caused Timm's score to drop by one point. Timm also pointed to the VRS-SO's estimate of the reoffense risk of similar individuals. Although Timm conceded he continued to have deviant arousal, he argued his risk profile no longer met the "more likely than not" legal threshold, and he emphasized that he had progressed in treatment since his initial commitment.

¶20      The circuit court expressed concern at Lodl's report that Timm continued to experience deviant sexual thoughts about children and about violence

---

[9] To receive a discharge trial under the prior version of WIS. STAT. § 980.09, the petitioner was required to present facts from which a court or jury "may conclude" the person's condition had changed since his or her original commitment. *See* **State v. Hager**, 2018 WI 40, ¶23, 381 Wis. 2d 74, 911 N.W.2d 17.

or force. The court noted Timm had reported recently masturbating to such fantasies despite his many years of treatment. Additionally, the court observed that Timm's progress in treatment had been "extremely slow." Based on the facts of record and Lodl's report, the court determined that a fact finder would not likely conclude that Timm no longer met the criteria for commitment as a sexually violent person. Timm now appeals the order denying his discharge petition without a trial.

## DISCUSSION

¶21     As an initial matter, we note that, after the circuit court's decision here, our supreme court decided *Hager*, which had been pending at the time the hearing on Timm's discharge petition was held in this case.[10] *Hager* resulted in a fractured decision that, given the various rationales of its three opinions, does not offer conclusive guidance to lower courts and litigants regarding the process for resolving a discharge petition under WIS. STAT. § 980.09(1) and (2). The prior version of those subsections established a two-step process: first, the circuit court conducted a paper review to determine whether the petition presented facts such that a trier of fact "may conclude" that the petitioner no longer met the criteria for commitment as a sexually violent person; if so, the court would then look to the record to see if it contained facts from which a trier of fact could find that the petitioner is no longer a sexually violent person. *See Hager*, 381 Wis. 2d 74,

---

[10] The Wisconsin Supreme Court consolidated Hager's appeal with that of Howard Carter for purposes of reviewing the sufficiency of both discharge petitions. *See Hager*, 381 Wis. 2d 74, ¶22. Those cases had been decided separately by this court. *See State v. Hager*, 2017 WI App 8, 373 Wis. 2d 692, 892 N.W.2d 740; *State v. Carter*, 2017 WI App 9, 373 Wis. 2d 722, 892 N.W.2d 754.

¶¶24-25 (plurality opinion) (citing ***State v. Arends***, 2010 WI 46, ¶¶27, 29, 38, 325 Wis. 2d 1, 784 N.W.2d 513).[11]

¶22    The dispute in ***Hager*** centered on the legislature's decision to increase the petitioner's burden of production for obtaining a discharge trial.  In particular, the court analyzed whether the change in the predictive standard for the fact finder from "may conclude" to "would likely conclude" allowed the circuit court, during its record review under WIS. STAT. § 980.09(2), to weigh the evidence for *and* against discharge when determining whether the burden of production has been met.  *See **Hager***, 381 Wis. 2d 74, ¶28 (plurality opinion). Additionally, one of the petitioners at issue in the ***Hager*** decision had argued that such weighing of evidence prior to an actual trial would violate his right to due process of law under both the federal and state constitutions, given that the burden of persuasion remains with the State.  *See **id.***, ¶3 (plurality opinion).

¶23    A three-member plurality of the supreme court concluded that the weighing of evidence was not allowed under WIS. STAT. § 980.09(2), but it then directed circuit courts to "carefully examine, but not weigh, those portions of the record they deem helpful to their consideration of the petition, including facts both favorable as well as unfavorable to the petitioner." ***Hager***, 381 Wis. 2d 74, ¶¶28, 30.  The plurality—or "lead"—opinion adopted this position, at least in part, because the "effect of allowing circuit courts to weigh the evidence would be to impermissibly shift the burden of persuasion to the committed person to prove he is no longer a sexually violent person." ***Id.***, ¶31; *see also **id.***, ¶43.

---

[11] The amended version of WIS. STAT. § 980.09(1) continues to focus solely on the allegations contained within the discharge petition.  In this case, the State stipulates that Timm's current petition satisfied the first step under § 980.09(1).

¶24    Two justices, in a concurrence authored by Justice Daniel Kelly, joined the lead opinion except to the extent that it held a court may not "weigh" evidence. *Id.*, ¶66 (Kelly, J., concurring). The concurring justices asserted that, contrary to the lead opinion, the "2013 amendments to WIS. STAT. § 980.09(2) not only allow weighing, they require it." *Hager*, 381 Wis. 2d 74, ¶66 (Kelly, J., concurring). The concurrence likened the "would likely conclude" standard to the prejudice prong of the ineffective assistance of counsel inquiry. *See id.*, ¶75. Unlike the lead opinion, the concurring opinion did not find this constitutionally problematic, because "the simple act of weighing, by itself, does not require the committed person to prove he is no longer sexually violent." *Id.*, ¶74.

¶25    A two-justice dissenting opinion concluded that the only reasonable interpretation of the "would likely conclude" standard was a directive to weigh the evidence for and against discharge. *Id.*, ¶82 (Abrahamson, J., dissenting). The dissenting opinion criticized the lead opinion for failing to "simply acknowledge that the amended statute requires weighing of evidence and is therefore constitutionally suspect." *Id.*, ¶84 (Abrahamson, J., dissenting).

¶26    As a result of the opinions in *Hager*, it appears that a majority of our supreme court (i.e., the two concurring justices and the two dissenting justices) agree that, during a record review of a discharge petition under WIS. STAT. § 980.09(2), a circuit court must weigh the evidence favorable to the petitioner against the evidence unfavorable to the petitioner. It also appears, however, that a majority of the justices (i.e., the three-member plurality and the two dissenting justices) deemed such a protocol, at a minimum, constitutionally suspect. Nonetheless, the supreme court's mandate and directions made clear that courts were to continue to apply § 980.09(2) using the supreme court's directive to

"carefully examine, but not weigh" the evidence during a record review. *See Hager*, 381 Wis. 2d 74, ¶¶64-65 (plurality opinion).

¶27    These issues with the meaning of *Hager* going forward are brought to the fore by the parties' arguments in this case. Timm notes "the lead opinion in *Hager* on the issue of weighing did not have the support of the majority of the court," and "the *Hager* court does not explain the practical difference between carefully examining the evidence vs. weighing the evidence." Likewise, the State posits that in *Hager*, "the supreme court did not resolve how a circuit court should apply [WIS. STAT. §] 980.09(2)'s increased burden of production when it reviews a discharge petition." The State argues, essentially, that we should decide de novo what § 980.09(2) requires, and it urges us to conclude the standard we should use is "substantially similar to what a criminal defendant must demonstrate to get a new trial based on newly discovered evidence."[12]

¶28    Contrary to what the parties' advocate here, we are bound by the *Hager* decision—at least insofar as we must adhere to the court's mandate, which clearly garnered a majority of the justices. *See Cook v. Cook*, 208 Wis. 2d 166,

---

[12] By way of further context, in the appellate proceedings before this court in *Hager*, we endeavored to resolve the meaning of the amendments to WIS. STAT. § 980.09(2) in a manner that avoided the constitutional burden-shifting concerns raised by a majority of the supreme court justices. We concluded the amendments "accomplished a material increase in the petitioner's burden of production." *Hager*, 373 Wis. 2d 692, ¶32. Rather than obligating courts to "weigh" the facts for and against the petitioner, however, we concluded § 980.09(2) required courts to "determine whether the facts in the record favorable to the petitioner, including those facts contained within or referenced by the enumerated items, establish a reasonable likelihood of success at an ensuing discharge trial." *Hager*, 373 Wis. 2d 692, ¶37. This conclusion was consistent with our determination that the legislative changes wrought by 2013 Wis. Act 84 were designed to, among other things, codify the existing case law requiring a petitioner to present something "new" justifying a discharge trial. *Hager*, 373 Wis. 2d 692, ¶¶40-41. Moreover, the parties agreed that such an interpretation of § 980.09(2) did not have obvious constitutional ramifications. *Hager*, 373 Wis. 2d 692, ¶44.

14

189, 560 N.W.2d 246 (1997) ("The supreme court is the only state court with the power to overrule, modify or withdraw language from a previous supreme court case."). Fortunately, in this particular case, we need not attempt to resolve the questions raised by the ***Hager*** decision. Faithful adherence to the supreme court's mandate means we must treat the "would likely conclude" predictive standard in WIS. STAT. § 980.09(2) as constitutional.[13] Moreover, regardless of whether § 980.09(2) does or does not require "weighing" of the evidence, we conclude in this case, as a matter of law, that Timm has failed to demonstrate his condition has sufficiently changed—even when we compare only the contents of his petition and the undisputed facts of record with the basic facts that existed at the time he admitted to the allegations contained in the State's original commitment petition.[14]

¶29     Again, to commit someone as a sexually violent person, the State must prove that the person: (1) suffers from a qualifying mental disorder; and (2) is dangerous because the disorder makes it likely that the person will engage in one or more acts of sexual violence. *See* WIS. STAT. § 980.01(7). Here, it is undisputed that Timm suffers from two mental disorders that predispose him to

---

[13] Despite an apparent majority of our supreme court supporting an interpretation of WIS. STAT. § 980.09(2) that involves weighing the evidence for and against the petitioner, the State requests (as it did in ***Hager*** before our supreme court) that we interpret that subsection "in a manner that allows the circuit court to assess a petition against the facts in the record without weighing those facts."

[14] The determination under ***Hager*** of whether a petitioner's condition has sufficiently changed so as to entitle him or her to a discharge trial is apparently one of law. After the three-justice plurality announced the "carefully examine, but not weigh" standard, it remarked that the court "could independently consider the record to determine whether a fact finder 'would likely conclude' that Hager no longer meets the criteria for commitment." ***Hager***, 381 Wis. 2d 74, ¶32. Nonetheless, the court elected not to apply the new standard, instead remanding to the circuit court to apply the procedures and standards articulated by the court. ***Id.*** Given this choice, the court did not provide a template application of the standard to which we could now look for guidance.

commit acts of sexual violence—namely, pedophilia and sexual sadism. Timm's discharge petition presents only the question of whether he remains dangerous because those disorders predispose him to commit acts of sexual violence.

¶30  Timm, emphasizing the new actuarial instruments used by Lodl, relies on our opinion in *State v. Richard*, 2014 WI App 28, 353 Wis. 2d 219, 844 N.W.2d 370.  There, we concluded a person is entitled to a discharge trial under WIS. STAT. § 980.09 when his or her petition "alleges that he or she is no longer a sexually violent person, and [the petitioner] supports his or her petition with a recent psychological evaluation applying new professional research to conclude that the petitioner is no longer likely to commit acts of sexual violence." *Richard*, 353 Wis. 2d 219, ¶1.  Timm argues that because *Richard* directs that a discharge trial is appropriate based on new actuarial instruments, the circuit court erred here by denying him such a trial.

¶31  *Richard* is of little aid to Timm because it was decided under the prior version of the discharge statute.  *See id.*, ¶¶12-13 & n.9.  Under that version's standard for receiving a discharge trial, the existence of new professional research—if applied to the petitioner by an expert to show that the petitioner's risk had fallen below the "more likely than not" threshold—constituted evidence from which a fact finder "may conclude" the petitioner was no longer dangerous.  But the current standard assesses what the fact finder "would likely conclude" based on the evidence.  Moreover, the legislative amendments make clear that the focus of the inquiry is on whether the person's condition has "sufficiently changed," rather than—as under the old standard—on whether they had merely supplied some evidence that they no longer met the criteria for commitment.  *See* 2013 Wis. Act 84, § 23.  As a result, an expert evaluation that applies new professional research is no longer sufficient, standing alone, to warrant a discharge trial.

16

¶32    Indeed, this case illustrates why ***Richard*** did not survive the petitioner's increased burden under the current version of WIS. STAT. § 980.09(2). Timm correctly notes that, under ***Richard***, he likely would have been entitled to a discharge trial based upon Lodl's application of new actuarial instruments, the Static-99R and the VRS-SO, which showed that offenders like Timm reoffended at lower rates.  But in changing the predictive standard to "would likely conclude," the legislature has authorized a more searching inquiry—even if one does not "weigh" the evidence—when determining whether there has been a sufficient change in the person's condition.  And the universe of material the court may consider in making that determination is quite large:  it includes

> evidence introduced at the initial commitment trial or the most recent trial on a petition for discharge, any current or past reports filed under [WIS. STAT. §] 980.07, relevant facts in the petition and in the state's written response, arguments of counsel, and any supporting documentation provided by the person or the state.

Sec. 980.09(2).

¶33    The problem with Timm's nearly sole reliance on the new actuarial scores is that his risk of reoffense, as estimated by the various instruments used over time, has never been particularly high.  The highest risk estimate for Timm, based on the reoffense histories of similarly scored individuals, was on the RRASOR, in which Jurek opined that approximately 49 and 73 percent of individuals like Timm were reconvicted over five- and ten-year periods.  But Jurek also noted Timm's scores on the MnSOST-R and the Static-99 did not exceed the

50 percent reconviction/rearrest threshold among similar individuals.[15] Consistent with Jurek's analysis, actuarial instruments applied by evaluators since Timm's initial commitment have regularly suggested his risk of reconviction or rearrest was less than 50 percent based on those instruments' samplings.

¶34 In terms of actuarial instruments that have "changed," it is undisputed that Timm is now older and, as a result, his original Static-99 score has dropped by one point under the revised Static-99R. Even assuming, as Timm does, that his score on the actuarial instruments is indicative of his individualized risk, this is not much of a "change" at all. Jurek scored Timm a four on the Static-99, which corresponded to a reconviction risk of 26 percent over five years, 31 percent over ten years, and 36 percent over fifteen years. According to Lodl's evaluation, Timm's score of three on the Static-99R equates to a "recidivism risk" of 11.3 to 17.2 percent over a five-year period and 18.2 to 28.5 percent over a ten-year period. Lodl's risk estimate based on the Static-99R is lower than Jurek's estimate based on the original instrument, but not significantly so, and certainly not enough to establish that a jury now "would likely conclude" Timm "no longer meets the criteria for commitment as a sexually violent person."

¶35 Moreover, as one of Timm's previous examiners noted, the actuarial instruments do not permit an evaluator to make a numerical prediction of a given individual's risk level. Rather, the instruments provide information about the risk group to which the person belongs, and what sorts of recidivism (typically, rearrest or reconviction) rates similar offenders experienced. The examiner stated, "A

---

[15] Timm equates the reconviction/rearrest rate among the sample groups with the "more likely than not" reoffense standard under WIS. STAT. § 980.01(7). As we explain *supra*, ¶35, this is, at best, an inelegant equivalency.

given offender's risk may be higher or lower than the probabilities associated with the group data." Another of Timm's examiners has written, "Given that actual recidivism rates are higher than detected rates, and this patient's life expectancy is greater than ten years, his estimated risk for reoffending is greater than that given in the actuarial tables." The limitations of actuarial assessments in ascertaining an offender's lifetime risk pursuant to WIS. STAT. ch. 980 appear generally undisputed.

¶36 Beyond these inherent limitations in these assessments, Timm largely ignores the fact that the psychologists who have assessed Timm's recidivism risk for sexual violence did not ground their evaluations solely on the use of those instruments. Importantly, they considered several dynamic factors, including sexual deviance, treatment effect, and aging. As a result, Timm's case is one where his actuarial scores are—and have been since his initial commitment—far less important than the dynamic risk factors consistently identified by his treatment providers.

¶37 Indeed, past examiners have noted that "[s]exual preference for children is the single greatest risk factor for sexual recidivism of child molesters." It is undisputed that Timm continues to struggle in this area, despite advancing slowly in his treatment.[16] Although Timm's treatment providers were more optimistic about his ability to manage his impulses to use force or violence, Timm

---

[16] Regarding Timm's progress in treatment, Timm's annual reexaminations routinely note that the "phase model of treatment is not applied rigidly" and that offenders may focus on work from a previous or more advanced phase. While Timm's formal advancement to phase three is commendable, it does not necessarily establish that he has made substantial gains in treatment such that a fact finder "would likely conclude" he no longer meets the criteria for commitment.

undisputedly continues to fantasize about, and masturbate to, sexual scenarios involving such acts. Additionally, the record shows that Timm has, at times, falsely reported that he was no longer entertaining fantasies about children and force, and he has demonstrated disinterest in continuing treatment. Timm's advances in treatment, such as they are, are laudable, but the contents of his petition do not demonstrate a likelihood that a jury would find in his favor at a discharge trial—i.e., that Timm no longer meets the criteria for commitment as a sexually violent person.

¶38 Again, we have not "weighed" the evidence here. It is not necessary for us to do so, as the facts contained in the petition, as well as the undisputed facts of record, demonstrate that not much about Timm has changed despite the length of his commitment. He may have a slightly lower actuarial risk, and he may have made some progress in treatment, but he continues to suffer from qualifying mental disorders, he has not completed the relevant treatment, and even his own expert acknowledges that he continues to struggle to manage his fantasies regarding children, force and violence. Lodl's concern is particularly noteworthy that Timm may not have "demonstrated sufficiently sustained change in his thoughts, attitudes, emotions and behaviors and sufficient management of his sexual arousal such that one could reasonably assume that, with continued treatment, the change could be maintained." Under these undisputed circumstances, neither the insubstantial changes in Timm's actuarial scores nor his marginal treatment progress, individually or in combination, provide a sufficient basis to determine that a fact finder "would likely conclude" Timm is no longer dangerous because his disorders no longer make it likely that he will engage in one or more acts of sexual violence.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.